1

2

3

4

5                  **UNITED STATES DISTRICT COURT**

6                  **EASTERN DISTRICT OF CALIFORNIA**

7

8    **MARY REID, an individual, residing in**        **CASE NO.  1:13-CV-00166-AWI-SKO**
     **California**
9                                                      **ORDER ON DEFENDANT'S MOTION**
                        **Plaintiff,**                 **FOR SUMMARY JUDGMENT**
10
                         **v.**                          **(Doc. 35)**
11
     **CONCENTRA HEALTH SERVICES,**
12   **INC, a corporation; and DOES 1 through**
     **100, inclusive,**
13
                        **Defendant.**
14

15

16          This case stems from Plaintiff Mary Reid's ("Reid") termination of employment from

17   Defendant Concentra Health Services, Inc. ("Concentra").  The Complaint alleges eight causes of

18   action: (1) failure to pay minimum wage in violation of Labor Code sections 1197, 1194, and

     1194.2; (2) failure to pay overtime in violation of Labor Code section 510; (3) failure to provide
19
     all mandated meal periods or additional wages in lieu thereof; (4) failure to provide all mandated
20
     meal periods or additional wages in lieu thereof; (5) failure to issue accurate wage statements in
21
     violation of Labor Code section 226; (6) failure to timely pay wages due at termination in
22
     violation of Labor Code sections 201, 202, and 203; (7) unfair competition in violation of
23
     Business and Professions Code section 17200; and (8) wrongful termination in violation of public
24
     policy.  Concentra now moves for summary judgment.  For the reasons that follow, Concentra's
25
     motion will be granted in part and denied in part.
26

27

28

## SUMMARY JUDGMENT FRAMEWORK

Summary judgment is proper when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970*)*; Fortyune v. American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying the portions of the declarations (if any), pleadings, and discovery that demonstrate an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). A fact is "material" if it might affect the outcome of the suit under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986); United States v. Kapp, 564 F.3d 1103, 1114 (9th Cir. 2009). A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. Anderson, 477 U.S. at 248; Freecycle Sunnyvale v. Freecycle Network, 626 F.3d 509, 514 (9th Cir. 2010).

Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the movant. Soremekun, 509 F.3d at 984. Where the non-moving party will have the burden of proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential element of the non-moving party's claim or by merely pointing out that there is an absence of evidence to support an essential element of the non-moving party's claim. See James River Ins. Co. v. Herbert Schenk, P.C., 523 F.3d 915, 923 (9th Cir. 2008); Soremekun, 509 F.3d at 984. If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion." Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1105–06 (9th Cir. 2000). If the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire, 210 F.3d at 1103. The opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence that sets

1  forth specific facts showing that there is a genuine issue for trial.'" Estate of Tucker v. Interscope

2  Records, 515 F.3d 1019, 1030 (9th Cir. 2008).

3      The opposing party's evidence is to be believed, and all justifiable inferences that may be

4  drawn from the facts placed before the court must be drawn in favor of the opposing party. See

5  Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Narayan v. EGL, Inc., 616 F.3d 895, 899

6  (9th Cir. 2010). While a "justifiable inference" need not be the most likely or the most persuasive

7  inference, a "justifiable inference" must still be rational or reasonable. See Narayan, 616 F.3d at

8  899. "If conflicting inferences may be drawn from the facts, the case must go to the jury." Holly

9  D. v. Cal. Inst. of Tech., 339 F.3d 1158, 1175 (9th Cir. 2003). Inferences are not drawn out of the

10 air, and it is the opposing party's obligation to produce a factual predicate from which the

11 inference may be drawn. See Sanders v. City of Fresno, 551 F.Supp.2d 1149, 1163 (E.D. Cal.

12 2008); UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004). "A genuine

13 issue of material fact does not spring into being simply because a litigant claims that one exists or

14 promises to produce admissible evidence at trial." Del Carmen Guadalupe v. Agosto, 299 F.3d

15 15, 23 (1st Cir. 2002); see Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir.

16 2002). The parties have the obligation to particularly identify material facts, and the court is not

17 required to scour the record in search of a genuine disputed material fact. Simmons v. Navajo

18 Cnty., 609 F.3d 1011, 1017 (9th Cir. 2010). Further, a "motion for summary judgment may not be

19 defeated ... by evidence that is 'merely colorable' or 'is not significantly probative.' " Anderson,

20 477 U.S. at 249–50; Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006). If the

21 nonmoving party fails to produce evidence sufficient to create a genuine issue of material fact, the

22 moving party is entitled to summary judgment. Nissan Fire, 210 F.3d at 1103.

23

24                              **FACTUAL BACKGROUND**[1]

25      Concentra is a business located in Addison, Texas with two medical centers in Fresno –

26 one in downtown and the other in South Fresno. See JSUF 1-2. In or about September 2006,

27

28 ------

[1] "JSUF" refers to the Joint Statement of Undisputed Facts, "DSSUF" refers to Defendant's Separate Statement of Undisputed Facts, and "PSSDMF" refers to Plaintiff's Separate Statement of Disputed Material Facts.

1   Concentra hired Reid as a Health Service Manager.  See JSUF 3.  Reid's primary duty in this

2   position was to bring in sales from new accounts that she generated and to recapture former

3   Concentra customers.  See DSSUF 7; Reid Depo. 71:15-21.  She was responsible for the South

4   Fresno territory and worked out of both the downtown and South Fresno offices.  See DSSUF 2;

5   Reid Depo. 66:14-16.  When she began, Concentra provided Reid with an employee handbook.

6   See DSSUF 3; Reid 145:14-19.  Reid understood that pursuant to this employee handbook

7   Concentra could terminate her employment for violating its standard of conduct, including failure

8   to follow instructions and disrespectful and/or unprofessional conduct.  See DSSUF 4; Reid Depo.

9   145:14-146:3.  During her employment, Concentra also provided Reid with "The Orange Book."

10  See JUSF 5.  Reid understood "The Orange Book" to inform employees "how we as a company

11  are to present ourselves and the message that we want to convey to all of our employees,

12  customers."  DSSUF 5; Reid Depo. 148:3-10.  "The Orange Book" emphasizes that one of

13  Concentra's values is that employees are to be respectful to each other.  See DSSUF 6; Reid Depo.

14  148:14-19.

15        In or around 2010, Concentra laid off the Account Managers, who had previously

16  performed account maintenance work, for "an economic reason."  See PSSDMF 2; Hittner Depo.

17  81:3-82:8.  Brian Mattos ("Mattos"), an Account Manager at Concentra from around January 2004

18  until May or June 2007, testified that Account Managers dealt with many reactive issues such as

19  "wait time issues, issues with the doctors, with regard to first aid, or recordable injury."  Mattos

20  Depo. 8:1-9, 17:15-25.  When the Account Managers were laid off, their duties were assigned to

21  the Client Relationship Managers, including Reid.  See PSSDMF 6; Hittner Depo. 95:15-96:22.

22  In April 2010, Concentra presented its formerly titled Health Service Managers, now referred to as

23  Client Relationship Managers, with a "2010 Incentive Bonus/Commission Plan."  See JUSF 6.

24  The plan provided Client Relationship Managers with $2,500 quarterly for account retention

25  activities, set a sliding commission scale for new account revenue, and allowed for discretionary

26  commissions.  See DSSUF 9; Thompson Decl., Exh. E.  The new plan also reduced Client

27  Relationship Managers earnable commissions by one percent.  See DSSUF 10; Reid Depo.

28  92:13-22.  Under this plan, Reid was given a choice in allocating 25%, 50%, or 75% of her time to

sales and the remainder to account maintenance.  See Reid Depo. 90:8-25.  Reid elected to devote 75% of her time to new sales and 25% to account management because she wanted to do "as little account maintenance as possible."  DSSUF 11; Reid 91:1-6.  However, she testified "there really was no choice because there was no one else to do account maintenance."  Reid Depo. 90:22-24. She further testified"[t]he new payment plan, the commission plan, and the new job duties were complaints I made on a fairly regular basis."  DSSUF 13; Reid Depo. 134:22-24.

On November 3, 2010, Joe Hittner ("Hittner") met with Reid and discussed how she managed her work day.  See JUSF 7; Reid 150:20-23.  On or about January 3, 2011, Hittner provided Reid with a memorandum entitled "CRM Role Clarification."  See JUSF 8.  In the memo, Hittner told Reid that he would not allow her to have as flexible a schedule as had her previous supervisor and expected her to adhere to the same schedule as the other CRMs "in order to gain consistency and add to your success."  DSSUF 19; Thompson Decl., Exh. F.  In the memo, Hittner told her to be in the office at 8:00 a.m. and to leave the office "no later than 10 a.m. to make new sales calls, perform account maintenance, and follow up on leads provided through general sales activity as well as through National Accounts/Chartis/Buxton, etc."  DSSUF 20; Thompson Decl., Exh. F.  Hittner also told her to be back in the office from 4/4:30 to 5:00 in order "to return phone calls, set new or follow up appointments, follow up on issues discovered in the field and document activities in [Client Relationship Management]."  DSSUF 21; Thompson Decl., Exh. F.  The memo also stated that "[a]ccount maintenance as mentioned above needs to play a greater role in your daily activity."  PSSDMF 23; Thompson Decl., Exh. F.  Additionally, Hittner instructed her to fax him a daily call tracker by 5:00 p.m. every day.  See DSSUF 23; Thompson Decl., Exh. F.

Reid testified that this schedule was unrealistic "[b]ecause the vast majority of my time was now being spent in the office doing account maintenance, which did not allow me to leave the office at 9:30 or 10:00 and remain outside of the office until 4:00 or 4:30.  You cannot handle large amounts of account maintenance in the field."  PSSDMF 8; Reid Depo. 157:19-25.  She told Hittner that "although this looks good on paper, it wasn't going to fit into the new role I now had to play."  PSSDMF 24; Reid Depo. 156:6-8.  Hittner preferred that employees make in person cold

calls (instead of over the phone), but Reid thought that was so "1970s" and a "huge waste of time because you got more no's than you were ever going to get yes's.  If I walked into your office on any given day without an appointment, I doubt you'd see me."  DSSUF 15; Reid Depo. 188:6-9; 189:1-2, 189:7-10.  Reid did not send Hittner a daily call tracker until October 2011.  See DSSUF 24; Reid 155:10-12; 180:20-23.

On or about January 27, 2011, Hittner completed and Reid received Reid's 2010 written performance review.  See JUSF 9.  In the review, Hittner told her to "follow through on the Jan 2011 account maintenance discussion with VP" and also that she needed to follow through on time and territory management and to exhibit Orange Book values.  See DSSUF 26; Thompson Decl., Exh. G.  The review also stated that "[Reid] is pacing at 180% of her new sales goal" and provided her with a "Performance Code" of "Performer" and a "People Behavior Code" of "Acceptable."  See Thompson Decl., Exh. G.

On September 9, 2011, Hittner and Reid met to discuss her August 2011 mid-year performance review.  See Reid 174:8-13; 184:15-22.  In the mid-year performance review, Hittner told her she needed to "focus on time and territory management and to grow sales funnel, continue to manage time away from center, . . . [and] exhibit Orange Book values."  DSSUF 28; Thompson Decl., Exh. H.  In this review, she again received a "Performance Code" of "Performer" and a "People Behavior Code" of "Acceptable."  See Thompson Decl., Exh. H.  The review did not mention Reid's failure to submit call trackers.  See PSSDMF 26; Thompson Decl., Exh. H.

As a function of her employment, Concentra asked Reid to attend the Public Agency Risk Managers Association ("PARMA") event.  Reid was not interested in the event because she would be "seeing people that already used the company."  She considered having to attend the event a "huge imposition on [her] for taking [her] away from [her] job as a salesperson for three days."  DSSUF 30; Reid Depo. 133:22, 134:1-3.  Reid, however, did attend the event.  See Reid Depo. 133:16-134:15.

Around this time, Reid expressed frustration to Area Operations Director Diana Roza ("Roza") about the account maintenance job, that it was taking up a lot of her time, and that she was not getting paid enough money for that additional responsibility.  See Roza Depo. 31:20-23.

1   Reid emailed Roza complaining about the PARMA event and Roza then forwarded this email to

2   Hittner.  See Roza Depo. 33:24-34:17, 36:10-17.  On October 3, 2011, Roza told Hittner that Reid

3   had complained to her in person about Roza previously forwarding Hittner Reid's objections to

4   attending the PARMA event.  See DSSUF 32; Roza Depo. 33:24-34:17, 36:10-17.  Roza also

5   informed Hittner about concerns that Downtown Fresno Center Operations Manager Kerrie

6   Sampson had that "Reid could be rude to the colleagues in the center, could be difficult to work

7   with."  DSSUF 33; Reid Depo. 20:25-21:5; Roza Depo. 40:18-24.  Roza told Hittner about hearing

8   Reid's comment to "Fuck Jay Blakey".[2]  See DSSUF 34; Roza Depo. 5:6-7, 18:21-19:1.  Reid

9   testified that "I did not have a great filter on what I would say, and that is my personality.  It is my

10  New York upbringing."  DSSUF 29; Reid Depo. 176:18-21.

11        On or about October 5, 2011, Hittner provided Reid with a written Performance

12  Improvement Plan ("PIP").  See JUSF 10.  In the PIP, Hittner wrote that Reid had not sent him a

13  single daily call sheet even though he had instructed her on January 3, 2011, and in four

14  subsequent discussions to do so every single day.  See DSSUF 36; Thompson Decl., Exh. I.  In the

15  PIP, Hittner complained about Reid's interaction with Roza concerning PARMA.  See DSSUF 37;

16  Thompson Decl., Exh. I.  In the PIP, Hittner told her to send him a daily call tracker by the close

17  of business each day Mary worked.  See DSSUF 38; Thompson Decl., Exh. I.  The PIP told her

18  "to follow the scheduled workday as outlined in her role clarification memo [January 3, 2011]."

19  DSSUF 39; Thompson Decl., Exh. I.  The PIP stated that "[f]ailure to meet performance

20  expectations will result in further disciplinary action up to and including termination of

21  employment."  DSSUF 40; Thompson Decl., Exh. I.  Part of Hittner's intent in issuing the PIP was

22  to discipline Reid for making the statements: "'I don't' – 'I don't want to do this.'  'This doesn't

23  make me money.'  'I can make more money from selling.'  'Why can't I just go out and sell?'

24  'Why do I have to do these other activities that don't make me money?' . . . 'Why do I have to

25  participate in calls?  They're an interruption to my day.'"  Hittner Depo. 40:1-9, 41:10-19.  Hittner

26  also testified that Reid "continued to complain about her job, her role in the company.  She

27  complained to other management about her job and what was required of her in her role in the

28

[2] Jay Blakey held the position of Senior Vice President Sales and Account Management at Concentra.

1  company.  She complained to others about me and my management of her.  So, you know, it just

2  continued."  Hittner Depo. 112:5-10.

3       Following the PIP, Reid was not always able to leave the office by 10:00 a.m., but rather

4  the time varied.  See Reid Decl.; Reid Depo. 202:18-23.  She "tried" to provide the call sheets to

5  Concentra by the end of the business day on each day that she worked.  See Reid Depo. 203:10.

6  But she did not always do so.  See DSSUF 42; Reid Depo. 204:14-22.  She testified that "[i]f I was

7  out of the office at a meeting and I was going home and it was going to take me past the clinic past

8  5:00 or if I was near my side of town, but, you know, I would stop at the postal net on my way

9  home and fax it from there."  Reid Depo. 203:10-14.  Sometimes though when Reid was out of the

10  office and it was too late to go the postal net she would fax the call sheets the next morning.  See

11  Reid Depo. 204:19-22.

12       Reid was one of the top five performers out of forty seven employees and, at the time of

13  her termination, Hittner had no criticism of the sales dollars Reid was generating because "Mary

14  can sell."  See PSSDMF 1; Hittner Depo. 45:17-19, 45:24-46:8, 115:23-116:3.  Reid testified that

15  she would start on paperwork at 5 a.m.  See Reid Depo. 109:7-9.  She also testified that she would

16  wake up at 5:30 a.m. to phone the Texas office.  See Reid Depo. 109:12-16; 112:5-8.  Every

17  Tuesday and Wednesday Reid had office meetings that lasted approximately 40 to 50 minutes.

18  See Reid Depo. 112:12-113:22.  She would return 30 to 40 calls per day which would take

19  approximately four hours per day, she would spend approximately 45 minutes per day sending

20  emails, and she would spend at least an hour per day doing research.  See PSSDMF 17; Reid

21  Depo. 120:9-19, 159:17-161:3; 161:22-162:2; 162:6-9.  Reid told Hittner at least occasionally that

22  she worked from home into the evenings.  See Hittner Depo. 99:24-100:8.  Hittner had no reason

23  to believe she was lying.  See Hittner Depo. 100:23-25.  Reid testified she worked approximately

24  60 hours per week.  See PSSDMF 19; Reid Depo. 178:15-17.

25       On December 2, 2011, Hittner terminated Reid's employment in her office, with Cathy

26  Sanders ("Sanders") connected to the conversation over the phone.  See DSSUF 43; Reid Depo.

27  207:6-14.  Reid testified Hittner did not state a reason for her termination but that the termination

28  paperwork he gave her said "due to cause."  See Reid Depo. 207:15-18.  The termination letter

dated December 2, 2011 corroborates this, "[a]s we have discussed, we believe that it is in the best interest of both parties to sever our relationship at this time.  In accordance with the policies and procedures of Concentra Health Services, Inc., a Nevada corporation (the "Company") and under the terms of your employment with the Company, we are hereby terminating your employment for cause under section 5(a)(v)."  Sutton Decl., Exh. M.  Hittner did not hand over a final paycheck during the termination meeting, but he thought Reid was set up with direct deposit.  See Hittner Depo. 119:16-19.  Reid did receive a final paycheck at some point that included five to six weeks of unused vacation time.  See Reid Depo. 129:22-25.  Reid testified that Sanders did not know the reason for her termination when Reid called her on the following Monday.  See Reid Depo. 208:4-19.  Hittner stated that he terminated Reid's employment for "[f]ailure to follow her coaching plan, the Written Warning Form in Exhibit 2, her inability to get in front of customers, her inability to direct issues to the proper people, her attitude with myself and others. . . . Not following her call plan, which included, you know, face-to-face calls with customers, cross-selling opportunities."  DSSUF 44; Hittner Depo. 59:23-60.  Hittner also stated that Reid's complaints about performing account maintenance duties were part of the reason she was fired.  See PSSDMF 35; Hittner Depo. 112:25-113:10.  But she had been complaining for years, "and I took it as good as anybody.  What finally led to her termination was her absolute refusal to [be compliant on her daily call report]."  Hittner Depo. 110:14-17.  Dani Kendall ("Kendall"), Vice President of Human Resources, approved the termination after reviewing performance documentation, including coaching memorandum and the PIP plan.  See Kendall Depo. 6:24-25, 14:6-25, 21:15-22:4, 69:23-25.  Hittner did not know of any written meal period policy issued to Client Relationship Managers during the time Reid worked at Concentra or to the present.  See PSSDMF 38; Hittner Depo. 172:16-19.

Throughout her employment Concentra classified Reid as an exempt employee.  See JUSF 4.  Nothing in the Client Relationship Manager training manual, however, discussed how much time the Client Relationship Manager should be working from home or office versus out in the field.  See PSSDMF 12; Hittner Depo. 230:7-24.  Reid testified that she spent no more than three hours per day outside of her office meeting with customers.  See PSSDMF 20; Reid Depo. 178:15-

17, 120:2-19.  In fact, Hittner was aware that Reid was spending most of the normal business hours at the Concentra office.  See PSSDMF 13; Hittner Depo. 68:24-69, 189:7-15.  The Client Relationship Managers job description further did not specifically lay out which duties were considered solely new sales versus account maintenance and Hittner could not explain how an employee would know what duties fell within the new sales versus account sales categories.  See PSSDMF 9; Hittner Depo. 134:15-135:21, 137:19-138:9.  Reid's contention is that she did not spend 75 percent of her time doing new sales work as stated in the commission plan.  See Reid Depo. 124:10-13.

## DEFENDANT'S MOTION

### A.  Causes of Action 1-6: Outside Salesperson Exemption

#### Defendant's Argument

Concentra argues that Reid was properly classified as an exempt employee under the "outside salesm[e]n" exemption in California Labor Code Section 1171.  As such, Reid's first through sixth causes of action should be summarily adjudicated because each of these claims is dependent upon Concentra's alleged misclassification of Reid as exempt.

Concentra concedes that Reid did not devote more than 50% of her workday on outside sales.  However, Concentra argues that Reid still qualified as an exempt employee because it was Reid's own refusal to follow Concentra's directions that led her to devote less than 50% of her workday to outside sales.  Hittner consistently expressed his displeasure verbally and in writing about Reid's refusal to do so.  And Concentra considered the expectations that Reid spend more time on sales realistic and gave her tools to do so, i.e.  a detailed schedule to follow and the call tracker to manage her time.

#### Plaintiff's Opposition

Reid counters that the job description created for her and others in her position failed to provide a necessary element to satisfy the "outside salesperson" exemption; that is, the job description did not provide that more than one-half of the employee's working time must be spent outside of the office engaged in sales.  Further, Reid emphasizes that the determination of whether

Reid qualified for the "outside salesperson" exemption is first and foremost dependent on how her time was actually spent.  Reid did in fact spend less than half of her working time away from her office or home.  Reid cites the Code of Federal Regulations for the proposition that when calculating how much time is spent at work for purposes of the "outside salesperson" exemption, time spent at home working counts as time spent at work.[3]

Reid argues that even if she followed Concentra's expectations and Hittner's proposed daily schedule she still would not have spent more than half her time performing outside sales. After the Health Service Managers were transitioned into Client Relationship Managers Reid was required to spend most of her work time doing desk work and not outside sales.  She worked 60 hours per week but the proposed schedule allocated only six hours per day outside of her office. Further, not all the activities outside the office qualify as outside sales since there was no way for Reid to earn a non-discretionary commission by performing account maintenance.  There was also no way for Concentra to distinguish between the time spent performing sales from the time spent performing account maintenance or other non-sales related activities.

Finally, Reid argues that Concentra's expectations of Reid's work schedule were not realistic.  Reid testified that after the change in job title, her account maintenance duties had to occupy the great majority of her time because "there was that much, and there was no one else to do it."

_Legal Standards_

Labor Code section 1171 provides that California's minimum wage and overtime laws apply to those "employed in any occupation, trade, or industry, whether compensation is measured by time, piece, or otherwise, but shall not include any individual employed as an outside salesman…."  The applicable wage order also states that its provisions "shall not apply to outside salespersons."  8 C.C.R. § 11040 1(C).  An "[o]utside salesperson" is one "who customarily and regularly works more than half the working time away from the employer's place of business

---

[3] See 29 C.F.R. § 541.502; but see Ramirez v. Yosemite Water Co., Inc., 20 Cal.4th 785, 797-98 (Cal. 1999) (definition of "outside salesperson" in wage order promulgated by Industrial Welfare Commission differs from standard applicable under federal Fair Labor Standards Act so that federal regulations may not be relied on in construing definition).

1   selling tangible or intangible items or obtaining orders or contracts for products, services or use of

2   facilities." 8 C.C.R. § 11040 2(M).  The question of whether an employee is an "outside

3   salesperson" turns on a "detailed, fact-specific determination." Ramirez, 20 Cal.4th at 790.  The

4   employer bears the burden of proving that the outside salesperson exemption applies.  See id. at

5   794-795.

6        California's wage order definition "takes a purely quantitative approach" and focuses on

7   whether the employee spends more than half of the workday engaged in sales activities outside the

8   office.  See id. at 797; see also Duran v. U.S. Bank National Association, 59 Cal.4th 1, 26 (Cal.

9   2014).  The exemption requires scrutiny of both the job description and an employee's own work

10  habits.  See Ramirez, 20 Cal.4th at 802; see also Duran, 59 Cal.4th at 26.  "On the one hand, if

11  hours worked on sales were determined through an employer's job description, then the employer

12  could make an employee exempt from overtime laws solely by fashioning an idealized job

13  description that had little basis in reality.  On the other hand, an employee who is supposed to be

14  engaged in sales activities during most of his working hours and falls below the 50 percent mark

15  due to his own substandard performance should not thereby be able to evade a valid exemption."

16  Ramirez, 20 Cal.4th at 802.  The trial court must "inquire into the *realistic* requirements of the

17  job" and in doing so "should consider, first and foremost, how the employee actually spends his or

18  her time."  Id.; see also Duran, 59 Cal.4th at 26.  Ancillary questions include "whether the

19  employee's practice diverges from the employer's realistic expectations, whether there was any

20  concrete expression of employer displeasure over an employee's substandard performance, and

21  whether these expressions were themselves realistic given the actual overall requirements of the

22  job." Ramirez, 20 Cal.4th at 802; see also Duran, 59 Cal.4th at 26.  "[E]vidence that most

23  members of a company's sales force actually spend the majority of their time working in the office

24  might be relevant to show that the employer's expectations regarding outside sales work were

25  unreasonable." Duran, 59 Cal.4th at 27.

26        *Discussion*

27        It is undisputed that Reid did not spend more than half her work day on outside sales.

28  Reid has also presented evidence that it was not realistic for her to spend more time on outside

sales given the corresponding increase in account maintenance work after the Health Service

Managers were transitioned into Client Relationship Managers.  Hittner testified that when the

Account Managers were laid off, their duties were assigned to the Client Relationship Managers,

including Reid.  Reid testified repeatedly about the amount of account maintenance work she had

to do after the transition and that she had to wake up early and work late into the night to get this

done.  Mattos testified about the kind of work that Account Managers were responsible for,

including dealing with many reactive issues such as "wait time issues, issues with the doctors,

with regard to first aid, or recordable injury."  Mattos Depo. 17:15-25.

Concentra counters that its expectations were realistic and it was Reid's own refusal to

follow Hittner's directions that led her to devote less than 50% of her workday to outside sales.

Hittner also expressed displeasure over this verbally and in writing.  Contrary to Reid's

suggestion, it is not a necessary perquisite for the job description to explicitly provide that more

than one-half of the employee's working time must be spent outside of the office engaged in sales.

Here, the "2010 Incentive Bonus/Commission Plan", Reid's election to spend 75% of her time on

sales, and Hittner's proposed work schedule informed Reid as to what the expectations of her

position were.  The schedule that Hittner provided Reid with was based upon a nine-hour workday

with well over half being spent outside the office.

The court cannot now resolve the factual issue of whether Concentra's expectations and

Hittner's proposed work schedule were realistic.  A reasonable jury could find that Concentra's

expectations and Hittner's proposed work schedule were not realistically feasible.  Conversely, a

reasonable jury could find that Reid was the exception for Client Relationship Managers at

Concentra and Hittner's plan for her was well within reason.  Whether an employee is an "outside

salesperson" turns on a "detailed, fact-specific determination."  Thus, whether Concentra's

expectations and Hittner's proposed work schedule were realistic or whether outside sales fell

below the 50% because of Reid's own refusal to follow directions or her own substandard

performance requires a detailed factual determination by a jury.  This is a material fact and Reid

has presented sufficient evidence for it to be a genuine issue for trial.  See Holly D., 339 F.3d at

1175 ("[i]f conflicting inferences may be drawn from the facts, the case must go to the jury.")

1    Summary judgment on this issue will be denied.

2    **B.  Cause of Action 1: Failure to Pay Minimum Wage**

3         *Defendant's Argument*

4         In the alternative to the "outside salesperson" exemption, Concentra argues that Reid's first

5    cause of action for failure to pay minimum wage should be summarily adjudicated because

6    Concentra paid her more than minimum wage for every hour she claims to have worked.

7    Concentra reasoned that, assuming Reid's hour estimation of 60 hours per week, Reid worked

8    3120 hours in 2010.  If Concentra takes Reid's February 2010 base salary of $44,918.43,

9    Concentra paid an hourly wage of approximately $14.40 ($44,918 / 3120 = $14.396).  Thus,

10   Concentra explains, it paid Reid at least six dollars in excess of California's minimum wage of

11   $8.00, even if Concentra considers Reid a nonexempt employee.

12        *Plaintiff's Opposition*

13        Reid responds that Concentra erred in calculating Reid's hourly wage in excess of

14   minimum wage since overtime wages must be calculated separately from one's base salary.  As a

15   result, Reid was not compensated for her overtime hours and is entitled to at least minimum wage

16   for each of those hours worked in excess of her regular, nonovertime hours.

17        *Discussion*

18        Labor Code section 1197 states that "[t]he minimum wage for employees fixed by the

19   commission is the minimum wage to be paid to employees, and payment of less than the minimum

20   so fixed is unlawful."  The applicable minimum wage fixed by the commission for employees

21   such as Reid is found in section 4(A) of the Industrial Welfare Commission Wage Order No. 4.

22   Importantly, Labor Code section 515(d)(2) elaborates on how compensation is calculated:

23   "(p)ayment of a fixed salary to a nonexempt employee shall be deemed to provide compensation

24   only for the employee's regular, nonovertime hours, notwithstanding any private agreement to the

25   contrary."  Labor Code section 515(d)(2) clearly reflects that payment of a fixed salary to

26   nonexempt employees provides compensation only for the employee's regular, nonovertime

27   hours.  Thus, Concentra incorrectly calculated Reid's per hour salary by combining overtime

28   hours with nonovertime hours in a calculation based upon her fixed salary.  Summary judgment on

1    this issue will be denied.

2    ***C.  Cause of Action 7: Unfair Competition***

3        *Parties' Submissions*

4        Reid also asserts a seventh cause of against Concentra for violating California Business

5    and Professions Code Section 17200 (known in California as the "Unfair Competition Law" or

6    "UCL").  Reid alleges that Concentra violated the Unfair Competition Law because Concentra

7    engaged in unfair business practices by violating Labor Code sections 226.7, 510, 201, 202, 203,

8    1194, 1194.2, 1197, provisions of the Industrial Welfare Commission Wage Order 4, and any

9    other applicable Wage Order. Concentra seeks for this court to summarily adjudicate all claims in

10   its motion for summary judgment.  The parties, however, do not specifically address this seventh

11   cause of action in their submissions on summary judgment.

12       *Legal Standards*

13       A business practice that is "unlawful, unfair, or fraudulent" is a violation of the Unfair

14   Competition Law. See Cal. Bus. & Prof. Code § 17200.  A violation of an "unlawful" business

15   practice requires a plaintiff to assert a violation of another law.  Cel–Tech Communications, Inc.

16   v. Los Angeles Cellular Telephone Co., 20 Cal.4th 163, 180 (Cal. 1999).  "Virtually any law-

17   federal, state, or local-can serve as a predicate for a section 17200 action."  State Farm Fire &

18   Casualty Co. v. Superior Court, 45 Cal.App.4th 1093, 1102-03 (Cal. Ct. App. 1996) (abrogated on

19   other grounds by Cel–Tech Communications, Inc., 20 Cal.4th at 184).  Where a plaintiff cannot

20   state a claim under the "borrowed" law, she cannot state an unfair competition law claim either.

21   Smith v. State Farm Mutual Automobile Ins. Co., 93 Cal.App.4th 700, 718 (Cal. Ct. App. 2001).

22       *Discussion*

23       In her complaint, Reid predicates her unlawful business practice allegations on "borrowed

24   law" from the Labor Code.  Since this Court previously addressed those claims and found that

25   Reid has presented sufficient evidence for a jury to find wage and hour violations, Reid has also

26   presented sufficient evidence for a violation of California's Unfair Competition Law as well.

27   Summary judgment on this issue will be denied.

28

***D. Cause of Action 8: Wrongful Termination in Violation of Public Policy***

   *Defendant's Argument*

Concentra concedes that Reid and Concentra were in an employee-employer relationship and that Reid suffered an adverse employment action with the termination of her job.  Concentra argues that Reid's complaints are not protected activity because Reid never introduced any evidence that she ever thought at any time during her employment (reasonably or otherwise) that Concentra was acting unlawfully with respect to her compensation or any other matter.  Concentra points out that many of the complaints Reid alleges to have made were also taken out of context in Reid's opposition from what was actually said during the depositions.  The complaints that Reid did make and that were testified to in depositions were generalized complaints about having to perform additional duties that an employer assigns to an employee.  They were not "a layperson's way" of telling Concentra it was paying her illegally.

Concentra also argues its reasons for terminating Reid are legitimate, non-retaliatory, and are not pretextual.  As previously quoted, Hittner explained in his deposition he terminated her for "[f]ailure to follow her coaching plan, the Written Warning Form in Exhibit 2, her inability to get in front of customers, her inability to direct issues to the proper people, her attitude with myself and others. . . . Not following her call plan, which included, you know, face-to-face calls with customers, cross selling opportunities."  DSSUF 44; Hittner Depo. 59:23-60.  These reasons are not challenged in Reid's opposition.  Accordingly, the burden shifts to Reid to present specific and "substantial responsive evidence" that Concentra's given reasons for termination are untrue and that retaliation is its true reason for termination.  This, Concentra claims, has not occurred.

   *Plaintiff's Opposition*

In her complaint, Reid's eighth cause of action is for wrongful termination in violation of public policy based upon retaliation for complaining about perceived violations of the Labor Code.  In her opposition to the summary judgment motion, Reid argues that she can establish a prima facie case of retaliation because her complaints are protected, she was subject to an adverse employment action, there is a causal link between her complaints and her termination, and the defendant's reasons for terminating her are pretextual.

1    Reid alleges her complaints are protected because they were based on a reasonable, good

2    faith belief that she was not being properly compensated for her work.  Additionally, her

3    complaints revolved around working conditions and the amount of her pay for which California

4    has a heighten public policy in protecting.  Further, her complaints were sufficiently specific to

5    convey her reasonable concern that Concentra acted unlawfully by not properly compensating her

6    for her work.

7    It is undisputed that Reid was subject to an adverse employment action as she was

8    terminated from her job.  Reid also claims that there is causal link between her termination and her

9    complaints as Hittner, a key decision maker in Reid's termination, testified in his deposition that

10   Reid's complaints about doing account maintenance work were part of the reason Concentra fired

11   her.  This causation is not challenged by Concentra.  Further, Reid claims that Concentra's reasons

12   for terminating her are pretextual.

13   *Legal Standards*

14   "When a plaintiff alleges retaliatory employment termination . . . as a claim for wrongful

15   employment termination in violation of public policy, and the defendant seeks summary judgment,

16   California follows the burden shifting analysis of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S.

17   792 (1973) to determine whether there are triable issues of fact for resolution by a jury."  <u>Diego v.</u>

18   <u>Pilgrim United Church of Christ,</u> 231 Cal.App.4th 913, 930 (Cal. Ct. App. 2014).  In the first stage

19   to establish a prima facie case, "a plaintiff must show (1) he or she engaged in a 'protected

20   activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a

21   causal link existed between the protected activity and the employer's action."  <u>Yanowitz v.</u>

22   <u>L'Oreal USA, Inc.</u>, 36 Cal.4th 1028, 1042 (Cal. 2005); <u>see also</u> <u>Diego</u>, 231 Cal.App.4th at 930.

23   Statutory provisions in California for a retaliation claim indicate that "protected activity"

24   can take many forms.  Section 12940(h) of the California Government Code makes it an unlawful

25   employment practice "[f]or any employer . . . to discharge, expel, or otherwise discriminate

26   against any person because the person has opposed any practices forbidden under this part or

27   because the person has filed a complaint, testified, or assisted in any proceedings under this part."

28   This court has elaborated that "protected activity" "involves some level of opposition to the

17

employer's actions based on the employee's reasonable belief that some act or practice of the employer is unlawful.  There must be some evidence that the employer knew that the employee was engaged in activities in opposition to the employer at the time of the claimed retaliatory action."  Kelley v. Corrections Corp. of America, 750 F.Supp.2d 1132, 1144 (E.D. Cal. 2010).  "Standing alone, an employee's unarticulated belief that an employer is engaging in discrimination will not suffice to establish protected conduct for the purposes of establishing a prima facie case of retaliation, where there is no evidence the employer knew that the employee's opposition was based upon a reasonable belief that the employer was engaging in discrimination. . . . [C]omplaints about personal grievances or vague or conclusory remarks that fail to put an employer on notice as to what conduct it should investigate will not suffice to establish protected conduct. . . . Nonetheless, we believe it is clear that 'an employee is not required to use legal terms or buzzwords when opposing discrimination.  The court will find opposing activity if the employee's comments, when read in their totality, oppose discrimination.'"  Yanowitz, 36 Cal.4th at 1046-1047; see also Chae v. Asian Americans for Community Involvement of Santa Clara County, Inc., 2002 Cal. App. Unpub. LEXIS 807, *23 (Cal. Ct. App. 2002) ("To constitute 'protected activity' the plaintiff must have expressly raised the issue of illegal discrimination, such as age or race discrimination.  [Citation.]  On the other hand, courts have held that simply complaining about unfair treatment or generally protesting employment decisions or working conditions is not a protected activity.")

Once an employee establishes a prima facie case, "the burden shifts to the employer to provide evidence that there was a legitimate, nonretaliatory reason for the adverse employment action.  [Citation.]  If the employer produces evidence showing a legitimate reason for the adverse employment action, 'the presumption of retaliation "drops out of the picture,"' [citation], and the burden shifts back to the employee to provide 'substantial responsive evidence' that the employer's proffered reasons were untrue or pretextual."  Diego, 231 Cal.App.4th at 930.  "Speculation cannot be regarded as substantial responsive evidence."  Martin v. Lockheed Missiles & Space Co., 29 Cal.App.4th 1718, 1735 (Cal. Ct. App. 1994).  The employee must set forth specific facts demonstrating "such weaknesses, implausibilities, inconsistencies,

incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'"  Hersant v. Department of Social Services, 57 Cal.App.4th 997, 1005 (Cal. Ct. App. 1997).

   *Discussion*

   Summary judgment must be granted on the wrongful termination in violation of public policy claim because there is insufficient evidence that Reid engaged in protected activity.  Reid has not introduced evidence that she ever thought at any time during her employment that Concentra was acting unlawfully with respect to her compensation, or any other matter, or that she actually complained that Concentra was acting unlawfully.

   Reid relies on alleged complaints to her supervisors that she was not getting lunch breaks and was required to take her lunches at her desk.  In actuality, she testified that:

> Q: Did you ever complain to anyone you were unable to take a meal period?
> A: That I was too busy potentially or that I didn't have time to take one.  I have said that in the past to people.
> Q: And who did you complain to?
> A: I said that to Barbara Sanchez.  I said that to Carrie Samson.  I said I can eat, but I will do it at my desk.
> Q: And that's what you said to both of them?
> A: Yes.
> Q: And when was that?
> A: Throughout the course of the last few years.
> Q: Do you know if they told anyone about that – the comments you were making about eating at your desk?
> A: Not to my knowledge.

Reid Depo. 212:6-21.  Reid never identified Sanchez or Samson's positions at Concentra, nor has she asserted that either played any role in her termination.

   Reid also relies on alleged complaints to Hittner "'(t)hat I was working many, many hours that I was not getting paid for' and that '. . . a very good portion of the hours I was working on as a client relationship manager I was essentially working for free' because she '. . . was getting (an) hourly wage . . . '"  This testimony, however, has nothing to do with complaints to Hittner.  Rather, the comments were made by Reid at the deposition in response to a question about the change from Health Service Manager to Client Relationship Manager:

> Q: Was the biggest thing that you didn't like about the change the fact that you had the potential to earn less commission?
> A: That and that I was working many, many hours that I was not getting paid for.

> Q: Meaning that you were working more hours than you had prior to becoming a client relationship manager?
> MR. SUTTON: Objection; misstates testimony.
> THE WITNESS: I was working more hours than I had when I was a health services manager, and a very good portion of the hours I was working as a client relationship manager I was essentially working for free.
> Q: BY MS. GRAHAM: Because you weren't earning commission on portions of that work?
> A: I wasn't getting hourly wage either for those.

Reid Depo. 177:11-25. There is no evidence that these comments were ever made to Hittner. An employee's unarticulated belief does not establish protected conduct for the purposes of establishing a prima facie case of retaliation. See Yanowitz, 36 Cal.4th at 1046.

Reid's opposition also states that "[o]n several occasions she complained that 'the vast majority of my time was now being spent in the office doing account maintenance . . . '" This testimony is also taken out of context. It is actually a comment to defense counsel about why Hittner's proposed work schedule did not fit into Reid's day:

> Q: How did it not fit into the new day?
> A: Because the vast majority of my time was now being spent in the office doing account maintenance, which did not allow me to leave the office at 9:30 or 10:00 and remain outside of the office until 4:00 or 4:30. . . .

Reid Depo. 157:18-23.

Hittner did testify several times about Reid's complaints regarding having to do account maintenance work. Specifically, as quoted previously, Hittner testified that Reid complained "'I don't' – 'I don't want to do this.' 'This doesn't make me money.' 'I can make more money from selling.' 'Why can't I just go out and sell?' 'Why do I have to do these other activities that don't make me money? . . . 'Why do I have to participate in calls? They're an interruption to my day.'" Hittner Depo. 40:1-9, 41:10-19. However, "complaints about personal grievances or vague or conclusory remarks that fail to put an employer on notice as to what conduct it should investigate will not suffice to establish protected conduct." Yanowitz, 36 Cal.4th at 1047. Reid never told Concentra that she thought Concentra legally owed her additional wages or that she was not properly getting paid for overtime work. Rather, her complaints reflect dissatisfaction with account maintenance work for which she earned a salary, but not the kind of commissions she did for sales work.

Even if Reid could establish a prima facie case, Concentra has numerous nonretaliatory

reasons for Reid's termination.  Hittner terminated her for "[f]ailure to follow her coaching plan, the Written Warning Form in Exhibit 2, her inability to get in front of customers, her inability to direct issues to the proper people, her attitude with myself and others. . . . Not following her call plan, which included, you know, face-to-face calls with customers, cross selling opportunities." DSSUF 44; Hittner Depo. 59:23-60.  Concentra has met its burden to produce legitimate, nonretaliatory reason for the adverse employment action.  Accordingly, the burden shifts to Reid to present specific and "substantial responsive evidence" that Concentra's given reasons for termination are untrue and that retaliation was the true reason for termination.

Reid has not met this burden.  She argues that "[t]he reasons provided by Hittner contradict her termination letter which simply states that 'we believe that it is in the best interest of both parties to sever our relationship at this time.'"  Reid, however, does not mention that the same letter states that the termination is "for cause."  In actually, the letter is not all contradictory.  Reid also argues that despite not substantially complying with many requests in the CRM Clarification Memo for over eight months, Reid "received a Behavior Rating of 'Acceptable'" on her 2011 mid-year performance evaluation.  Again, she does not mention that this rating is actually a "People Behavior Code" and that she received the same "Acceptable" rating earlier in the year in her 2010 written performance review dated January 27, 2011.  She further argues the fact that the mid-year performance evaluation did not address the daily call trackers or the schedule outlined in the CRM Clarification Memo illustrates a lack of importance to Concentra of these matters.  However, the call tracker issue had previously been raised in other forms and the mid-year performance evaluation as a whole contains very minimal information.

Reid argues that "Hittner admitted that part of the reason for the PIP was to 'bring her in line' and to be [] 'hit over the head' because of the complaints Reid had made."  This misstates the testimony.  Rather, the quoted statements by Hittner are in reference to the PIP as a whole:

> Q: And did you, in issuing Exhibit 2, which is called "Performance Improvement Plan Written Warning Form," intend, at least in part, to discipline Mary Reid for the statements that you just attributed to her?
> A: Well, as it relates to Exhibit 2, Written Warning Form, these were several things that – yeah, I mean, I think it's included in paragraph 3 of that.  I think it's included in paragraph 2 of this.  So some of those statements are molded in that, but, you know, at the time, you again, my written warning to Mary was an intent for her to

understand the seriousness of her behavior and that we were taking it seriously and, again, trying to coach and get an employee who's going to continue – because we're salespeople – produce, be a part of the team and that sort of thing.  This – was an attempt to bring in line.  It may not have included everything and every conversation that we had.  I just am not – you know, this is – this is a hit over the head as it is.  I don't need to bludgeon somebody with that sort of thing.

Q: Okay.  But part of your intent in issuing the written warning, Exhibit 2, was to discipline her for making the statements that you've attributed to her that you just listed a few minutes ago, such as, "Why do I have to do this? It doesn't make me any money," et cetera?

MS. GRAHAM: Asked and answered.

BY MR. SUTTON:

Q: Correct?

A: Yes.

Hittner Depo. 40:15-41:19.  In any event, the complaints at issue here were listed by Hittner as: "'I don't' – 'I don't want to do this.'  'This doesn't make me money.'  'I can make more money from selling.'  'Why can't I just go out and sell?'  'Why do I have to do these other activities that don't make me money?' . . . 'Why do I have to participate in calls?  They're an interruption to my day.'"  Hittner Depo. 40:1-9, 41:10-19.  As already discussed, these statements were not protected conduct.  "[C]omplaints about personal grievances or vague or conclusory remarks that fail to put an employer on notice as to what conduct it should investigate will not suffice to establish protected conduct."  Yanowitz, 36 Cal.4th at 1047.

Finally, Reid claims, the reasons in the CRM Clarification Memo and the PIP were pretextual because if they had been the actual motivation Concentra would have terminated Reid much sooner instead of after Reid had begun to substantially comply with many of Hittner's recommendations.  Reid, however, had only begun to partially comply with Hittner's recommendations and the fact that Reid remained one of Concentra's leading sellers does not detract from the fact that Concentra perceived she was neglecting other duties.  In sum, there is insufficient evidence of pretext.  Summary judgment on the eighth cause of action will be granted.

## CONCLUSION

Concentra moves for summary judgment on all claims alleged against it.  With respect to the first six causes of action there are genuine disputed issues of material fact.  Reid's evidence is sufficient to indicate that Concentra's work expectations were unrealistic and that Reid was improperly classified as an exempt employee.  Thus, summary judgment will be denied for these

22

1  six claims.

2        Reid has predicated her unlawful business practice claim on "borrowed law" from the first

3  six causes of action.  Accordingly, summary will be denied on the seventh cause of action as well.

4        As for the eighth cause of action, there is insufficient evidence that Reid's complaints were

5  protected activity.  In the alternative, Concentra has legitimate, nonretaliatory reasons for Reid's

6  termination.  Reid does not have specific and "substantive responsive evidence" that these reasons

7  are pretextual.  Thus, summary judgment will be granted.

8

9                                    **ORDER**

10 Accordingly, IT IS HEREBY ORDERED that:

11    1.  Defendant's motion for summary judgment with respect to Plaintiff's Eighth Cause of

12        Action is GRANTED;

13    2.  Defendant's motion for summary judgment is otherwise DENIED; and

14    3.  The parties are directed to contact the Magistrate Judge within ten days of service of this

15        order for the purpose of setting new pre-trial conference, trial, and settlement conference

16        dates.

17

18 IT IS SO ORDERED.

19 Dated:   April 14, 2015                    _____

20                                            SENIOR  DISTRICT  JUDGE

21

22

23

24

25

26

27

28